**REDACTED**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HARPER INSURANCE LIMITED, RIVER
THAMES INSURANCE COMPANY LIMITED and
GUILDHALL INSURANCE COMPANY
LIMITED,

                           Petitioners,

    v.

CENTURY INDEMNITY COMPANY,

                        Respondent.

CIVIL ACTION NO. 10-CIV-7866

Hon. Naomi Reice Buchwald

## CENTURY INDEMNITY COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PETITION TO VACATE ARBITRATION AWARD AND IN SUPPORT OF COUNTER-PETITION TO CONFIRM AWARD

WHITE AND WILLIAMS LLP
Andrew I. Hamelsky, Esquire
One Penn Plaza
41st Floor, Suite 4110
New York, NY 10119
212.631.4406
hamelskya@whiteandwilliams.com

Of Counsel:

Christine G. Russell, Esquire
Ellen K. Burrows, Esquire
Brendan D. McQuiggan, Esquire
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19102
(215) 864-6301/7028/7173

Attorneys for Respondent, Century
Indemnity Company

6876008v.4

## TABLE OF CONTENTS

**PAGE**

I.  Introduction ....................................................................................................................1

II.  Factual Background ........................................................................................................2

   A.  The Parties' Reinsurance Relationship – Treaty 101 ................................................2

   B.  London's Reinsurance Documentation Requirements or "RDRs" Regarding Asbestos Bodily-Injury Claims ................................................................................................4

   C.  The Treaty 101 Arbitration .......................................................................................5

      1. Procedural Matters. ...............................................................................................5

      2. Substantive Issues Addressed in the Treaty 101 Phase 1A Arbitration. ................7

      3. The Arbitration Panels' Awards. ...........................................................................9

      4. Operation of the Powers Panel's December 10, 2006 Award and the Panel's Subsequent Relinquishment of Jurisdiction. ..........................................................11

III.  Argument ....................................................................................................................13

   A.  LMC'S Petition to Vacate Was Not Timely Filed. .................................................13

      1. LMC Did Not File Their Petition to Vacate Within Ninety Days of the Date the Award Was Delivered, As Required by New York Law. .................................................14

      2. LMC's Petition to Vacate Was Not Timely Filed Even if Governed by the FAA. ...........15

   B.  The Powers Panel's Award Represents a Proper Exercise of the Panel's Authority and is not Subject to Vacatur Under § 10(a)(4) of the FAA or New York Arbitration Law ...............16

      1. This Court Must Accord Great Deference to the Powers Panel's Decision .......................16

      2. LMC Cannot Meet Their Heavy Burden to Prove a Basis for Vacatur Under Either the FAA or New York Law. ..................................................................................................19

IV.  Century's cross-motion for confirmation pursuant to 9 U.S.C. § 207 ..............................22

V.  Conclusion ....................................................................................................................23

## TABLE OF AUTHORITIES

PAGE

### CASES

Azrielant v. Azrielant, 301 A.D.2d 269 (N.Y. App. Div. 2002)..................................18, 19

Banco de Seguros del Estado v. Mutual Marine Office, Inc., 344 F.3d 255 (2d Cir. 2003)...................................................................................................................17

Brown & Williamson Tobacco Corp. v. Chesley, 777 N.Y.S.2d 82 (N.Y. App. Div. 2004)...........................................................................................................18

Certain Underwriters at Lloyd's v. Century Indemnity Company, 2005 WL 1941652 (E.D. Pa. August 1, 2005)...........................................................................6

Duferco Int'l Steel  Trading v. T. Klaveness Shipping A/S, 333 F.3d 383 (2d Cir. 2003)...................................................................................................................16

Florasynth Inc. v. Pickholz, 750 F.2d 171 (2d. Cir. 1984)...................................................15

Glover v. IBP, Inc., 334 F.3d 471 (5th Cir. 2003)................................................................17

Goldfinger v. Lisker, 500 N.E.2d 857 (N.Y. 1986)..............................................................19

Hakala v. J.P. Morgan Securities, Inc., 2006 WL 1788962 (2d Cir. 2006)........................14

Hall Street Assoc's LLC v. Mattel, Inc., 128 S. Ct. 1396 (2008).......................................23

Local 802 v. Parker Meridien Hotel, 145 F.3d 85 (2d. Cir. 1998)......................................14

McCelland v. A. Z. Rilyan, 31 F. Supp. 2d 707 (W.D. Mo 1998)......................................15

Mut. Fire, Marine & Inland Ins. Co. v. Norad Reins. Co., 868 F.2d 52 (3d Cir. 1989).....................................................................................................................17

Matter of New York State Correctional Officers & Police Benevolent Assn. v. State of New York, 726 N.E.2d 462 (N.Y. 1999)..........................................................18

PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd, 659 F. Supp. 2d 631 (E.D. Pa. 2009), aff'd, 2010 WL 4409655 (3d Cir. Nov. 8, 2010)..........................21

Prostyakov v. Masco Corp., 513 F.3d 716 (7th Cir. 2008)..................................................17

6876008v.4

R&Q Reinsurance Co. v. American Motorist Insurance Co., et al., 2010 WL
    4052178 (N.D. Ill. Oct. 14, 2010)...................................................................15

ReliaStar Life Ins. Co. of New York v. EMC Nat'l Life Co., 564 F.3d 81 (2d Cir.
    2009).......................................................................................................17, 18

Security Ins. Co. of Hartford v. TIG Ins. Co., 360 F.3d 322 (2d Cir. 2004) ...............13, 14

Matter of Silverman [Benmor Coats], 461 N.E.2d 1261 (N.Y. 1984)................................18

United Transp. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376 (3d Cir.
    1995) ............................................................................................................17

Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200 (2d Cir. 2002) ............17, 18

Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15 (2d Cir. 1997)...13, 23

## STATUTES

9 U.S.C. §1, et. seq..........................................................................................13

9 U.S.C. § 10 .................................................................................13, 17, 23

9 U.S.C. §12 .......................................................................................................15

9 U.S.C. §§ 201- 208 ...........................................................................................13

9 U.S.C. § 202 ....................................................................................................13

9 U.S.C. § 207 ...........................................................................................3, 5, 22, 23

U.S.C. § 207 .......................................................................................................23

N.Y.C.P.L.R. § 7511(a) .................................................................................14, 18,
                                                                                          22

## OTHER SOURCES

The Nature of Reinsurance in REINSURANCE (Robert W. Strain ed.),
    supra, at 9..........................................................................................8, 9, 10, 11

6876008v.4

**REDACTED**

## I.    INTRODUCTION

In 2005, following years during which Century Indemnity Company's ("Century's") reinsurance claims for asbestos bodily injury were inappropriately delayed and denied by Century's London-based reinsurers, Century initiated a comprehensive arbitration under its principal reinsurance treaty, Treaty 101.  The parties engaged in extensive discovery and briefing and participated in a six-day evidentiary hearing.  Century obtained multiple awards in its favor.[1] After operating without incident under these awards for well over three years, three London-based reinsurance companies (collectively "LMC"),[2] which represent a fraction of the interests that were at stake in the arbitration as a whole, have asked this Court to step in and vacate one of the awards (the Powers Panel "Phase 1A Award").  There is no basis for the Court to do so.

First and foremost, LMC's petition was not timely filed.  While LMC have moved pursuant to the FAA, there is a good argument that New York procedural arbitration law applies to this case.  Under New York law, a party to an arbitration must move to vacate an arbitration award within 90 days from delivery of the award.  Whether you calculate 90 days from either the Phase 1A award, dated December 10, 2006, or from the final award, dated July 15, 2010, LMR's petition was filed out of time under New York law.  Even if the three-month period for filing a petition to vacate under the FAA applies, it is clear that that period began to run as of the entry of the Phase 1A Award on December 10, 2006.  Either way, LMC's petition is late and should be dismissed on that basis alone.

---

[1] The procedural aspects of the arbitration process are discussed more fully at Part II.C.1., below.

[2] The Century reinsurance program at issue here involved a number of London-based reinsurers.  Only three of the London Market Companies that participated in the arbitration (Harper Insurance, River Thames Insurance and Guildhall Insurance), which are all now affiliated as part of the Enstar Group, ....  seek to vacate the arbitration award.  These three reinsurers are hereinafter collectively referred to as "LMC."  Century's London-based reinsurers, as a whole, are referred to as "London Market Reinsurers" or "LMR."

If the court were to determine that it needs to perform a substantive analysis of LMC's petition, it must be denied nonetheless.  Under either the FAA or New York law, the Court's scope of review of the arbitrators' award(s) is extremely limited.  Arbitrators' decisions are entitled to great deference and courts are required to enforce arbitration awards so long as there is even a barely colorable justification for the outcome.  Unless an arbitrator's decision is found to be totally irrational, it must be upheld.  In this case, as both the record and the award make abundantly plain, the parties had submitted for resolution under the broad arbitration clause in the reinsurance contract the questions how and when reinsurance claims (including disputed claims) were to be paid under the Treaty.  The Powers Panel properly decided the issues submitted and fashioned a remedy -- a Protocol for the payment of claims -- that reasonably interpreted the parties' contractual obligations under the Treaty.  In doing so, the Panel executed its duty:  to interpret Treaty 101 and to fashion a remedy effecting its general purpose.  Thus, the award must stand under either federal or New York law.

## II.   FACTUAL BACKGROUND

### A.   The Parties' Reinsurance Relationship – Treaty 101

"Treaty 101" was a comprehensive reinsurance program that Century had in place to provide reinsurance for a portion of its insurance business, including casualty losses, between 1941 and 1967.[3]  LMR first participated on Treaty 101 in July 1951, gradually assuming a larger participation until, by July 1961, LMR were the lead reinsurers.  The identity and participation percentages of the London Market participants varied somewhat over the years, and the Treaty wordings changed slightly over time, but the purpose of the Treaty 101 reinsurance program

---

[3] In a reinsurance treaty, the reinsurer agrees to indemnify the reinsured with respect to a specified portion of the reinsured's obligations under insurance policies issued by the reinsured, in exchange for a portion of the premium paid to the reinsured for the underlying insurance policies. *See, e.g.*, Henry T. Kramer, *The Nature of Reinsurance*, in REINSURANCE 1, 5 (Robert W. Strain ed. 1980).

**REDACTED**

remained the same – to provide Century (then INA) with comprehensive reinsurance protection for, among other classes of business, its casualty insurance losses.[4]

Treaty 101 required the reinsurers to "follow the form" of the policies issued by Century and to bear their share of any liability imposed under them:

> The liability of the Reinsurers shall follow that of the Company in every case and shall be subject in all respects to all the general and special stipulations, clauses, waivers and modifications of the Company's policy, binder or other undertaking, and any endorsements thereon. . . .

(*See* Treaty 101, LMC Exh. 1, at Art. VII.)[5]  In addition, the Treaty required reinsurers to "follow the settlements" of Century – to be bound by the claims-handling and settlement decisions that Century made with respect to such policies:

> All payments of claims . . . in which this reinsurance is involved shall be binding upon the Reinsurers, who shall be bound to pay or allow, as the case may be, their proportion of such payments . . . .

(*Id.* at Art. VIII, Claims.)  In most years, Treaty 101 provided a mechanism for the payment of amounts due to either side:

> The Company will forward to the Reinsurers within twenty-one (21) days after the close of each month, . . .
>
> (a)  Report of premiums;
> (b)  Statement of claims paid and salvages recovered;
> (c)  Account Current summarizing premiums, claims paid and salvages recovered;

---

[4] Harper Insurance Limited, River Thames Insurance Co., Ltd., and Guildhall Insurance Co. Ltd., (collectively "LMC"), are successors in interest to three of the many London Market reinsurance companies that participated on Treaty 101.  They participated in one three-year period, 1965 to 1967, (assuming less than 10% of the total treaty participation in each of those years) out of the almost forty years that London Market Reinsurers participated on Treaty 101.  Despite this minor and short participation, LMC are the only London reinsurers seeking to vacate the arbitration award at issue.

[5] To avoid duplication of exhibits, Century cites, wherever possible, to the exhibits attached to LMC's Petition to Vacate Arbitration Award, in the following format:  (*See* LMC Exh. ___ .)

and the balance due either party, as indicated by the aforesaid Account Current shall be remitted by the other within seventy-five (75) days after the close of said month.

.... Any loss that does exceed an amount of Twenty-five Hundred Dollars ($2500) shall either be carried to account or remitted by the Reinsurer to the Company at the option of the latter. ...

(*See, e.g.*, Treaty 101 effective 1961, Exh. A hereto, at Art. IX (emphasis added).) Other periods, such as 1965 to 1967, did not provide a specific time within which payment of claims was due from reinsurers. Nothing in any treaty period's wording, however, permitted reinsurers to withhold payment entirely, even if claims were disputed. Instead the Treaty contemplated the prompt flow of funds, with any disputes to be settled by arbitration and accounts to be adjusted accordingly. Evidencing that intent, a practice was established in the early years of Treaty 101 whereby losses were pre-funded by way of "Outstanding Cash Advances" or "OCAs" provided by LMR to Century. (*See generally* Century's Pre-Hearing Brief, LMC Exh. 10, at 8-10, 14-16.)

The contract's arbitration clause provides as follows:

In the event of any dispute between the Company and the Reinsurers in connection with this Agreement, such dispute shall be submitted to arbitration.
                                    * * *
The arbitrators and the umpire shall interpret this Agreement as an honorable engagement and shall make their award with a view to effecting the general purpose of this Agreement in a reasonable manner, rather than in accordance with a literal interpretation of the language. ... Arbitration shall take place in such place as agreed upon by the arbitrators, and the arbitration law of New York State shall govern such arbitration. ...

(LMC Exh. 1 at Art. XII.)

## B. London's Reinsurance Documentation Requirements or "RDRs" Regarding Asbestos Bodily-Injury Claims

Beginning in the early to mid-1980s, insurers and reinsurers alike came under considerable economic pressure resulting from an ever-increasing flood of asbestos bodily-injury and other latent toxic exposure claims. (*See generally* Century's Opening Brief in Support of Declaratory Relief, LMC Exh. 7, at 10-11.) In or around 2001, LMR sought to slow or stop their

-4-

6876008v.4

payment of asbestos claims by unilaterally imposing certain purported claim-handling

requirements for such claims (the Reinsurance Documentation Requirements or "RDRs") that

could be found nowhere in the contract or in the parties' long course of dealing up to that point.

(*Id.* at 20-22, 26-33.) LMR refused to advance payment for these asbestos claims as required by

the Treaty and instead insisted that Century must first jump through the series of extra-

contractual hoops represented by the RDRs. Over the years, this led to a considerable bottleneck

in LMR's payments for asbestos claims, and to a large number of policyholder specific

arbitrations on the subject. (*Id.* at 33-85.) Recognizing a need for global resolution of this

dispute, Century initiated arbitration.

    **C.**    **The Treaty 101 Arbitration**

        **1.**    **Procedural Matters.**

On May 13, 2005, Century initiated one comprehensive arbitration under the Treaty 101

program (covering all years and layers of the Treaty) to address, as to currently due and future

claims, LMR's delay and non-payment practice that had become the norm. (*See* May 13, 2005

Arbitration Demand, LMC Exh. 2.)[6] As specifically stated, Century sought both an award as to

past due amounts and declaratory relief to address "LMR's consistent pattern and practice of

delay, obstruction, and failure and refusal to timely pay [asbestos] claims." (*Id.*) LMR objected

to this arbitration demand, taking the position that each separate wording of Treaty 101 should be

subjected to a separate arbitration with a separate Panel. (*See* June 13, 2005 Letter from J.

Gordon to T. Allen, LMC Exh. 3.) LMR named eight separate arbitrators and demanded that

eight separate arbitration Panels be constituted to address the matters in dispute. LMR also filed

a motion in the United States District Court for the Eastern District of Pennsylvania, seeking to

---

[6] Similar arbitration demands were made under Century's other treaty programs negatively impacted by
the RDRs.

compel eight separate arbitrations.  (*Id.* at 3.)  LMR's clear intention was to allow it to have eight

separate "bites of the apple" as opposed to one comprehensive resolution of the overarching

dispute.  Ultimately, the Eastern District Court ruled that it could not order consolidation,

because consolidation is a matter for arbitrators to decide.  *See Certain Underwriters at Lloyd's*

*v. Century Indemnity Company,* 2005 WL 1941652 (E.D. Pa. August 1, 2005) (Newcomer, J.).

Eight separate panels were then formed.  In recognition of the virtually complete overlap

regarding the issues, the Treaty 101 wordings, and to some extent the Panels themselves, the

arbitrators in the eight proceedings agreed to a process by which the substantive dispute would

be heard initially by one lead Panel (referred to by the parties as the "Hunter Panel" based on the

identity of LMR's party-appointed arbitrator).  The other panels were invited to attend and

participate at the evidentiary hearing so as to avoid needless repetition of the process.  Each of

the panels, including the "Powers Panel" which issued the specific award that is the subject of

LMC's Petition to Vacate, reserved to itself the right to hold subsequent hearings, to deliberate

individually and to issue its own separate award.  (*See* Organizational Meeting Transcript, LMC

Exh. 4, at 18:4-25:19.)

The Hunter Panel determined to sequence the proceedings into three phases.  The first

hearing (Phase 1A) was held to address treaty operation issues, including LMR's payment

obligations under Treaty 101 with respect to asbestos claims.[7]  The Phase 1A hearing before the

Hunter Panel was held from October 16-21, 2006, with over 5 days of evidence being presented

and argument being entertained.  Thereafter, on October 24, 2006, the Hunter Panel issued its

---

[7] *See* August 17, 2006 E-Mail from E. Thompson to Treaty 101 Panels and counsel and August 26, 2006
E-Mail from E. Thompson to Treaty 101 Panel and counsel, Exhs. B and C hereto.  Phase 1B addressed
the question whether LMR's imposition of the RDRs was in bad faith such that it would entitle Century to
an award of additional damages.  Phase II addressed issues specific to particular policyholder accounts.
Neither Phase IB nor Phase II is relevant to the issues to be decided on LMC's Motion to Vacate.

award. Each of the other Treaty 101 Panels subsequently convened and issued its own award.
The Powers Panel Phase 1A award was entered on December 10, 2006. (*See* LMC Exh. 13.)

2. **Substantive Issues Addressed in the Treaty 101 Phase 1A Arbitration**.

The substantive questions submitted for resolution in the Treaty 101 Phase 1A arbitration
were the contractual interpretation issues: (1) whether LMR were entitled to withhold payment
of Century's asbestos claims pending compliance with the RDRs (and whether LMR were
entitled to enforce the RDRs at all); and (2) when and how LMR were obligated to pay asbestos
claims once billed, including who was entitled to "hold the money" pending LMR file audits
and/or any disputes over the billings. (*See, e.g.*, Century's Pre-Hearing Brief, LMC Exh. 10, at
5-18; October 16, 2006 Hearing Transcript, Exh. D hereto, at 28:16-31:18 (opening statement of
Century Indemnity Company).) In its Opening Brief, Century laid out the historical relationship
between the parties (LMC Exh. 7 at 1-18); the breakdown and breach in that relationship
represented (most immediately) by the RDRs *(id.* at 20-86); the truly minimal requirements for
reimbursement under the treaty language and law (*id.* at 94-107); and the Panel's nearly
unlimited power to fashion relief under the "honorable engagement" clause of the arbitration
article and arbitration law (*id.* at 89-92). In its Pre-Hearing Brief, Century described the specific
contract provisions mandating speedy payment of claim (LMC Exh. 10 at 5-13) and introduced
examples from the parties' course of dealing demonstrating that funds were intended to flow
promptly to Century (*id.* at 14-17). At the evidentiary hearing, the panel heard extensive
testimony from five live witnesses, considered over 300 exhibits, and entertained argument on
the issues presented. The transcript spans nearly 1600 pages.

For example, Judith Harnadek, Vice President of Reinsurance, on behalf of Century,
explained that satisfaction of LMR's RDRs had no basis in the contract as a prerequisite to
payment. (*See* Exh. D hereto at 116:24-118:21, 155:10-157:3, 158:14-22 (Testimony of J.

Harnadek).)  Ms. Harnadek further testified about, and demonstrated through exhibits, how the RDRs were inconsistent with the historical practice of advancing/pre-paying funds into trust for Century, through the "OCA" mechanism, to ensure nearly immediate payment of claims.  (*See id.* at 124:21–125:11; 131:18-136-9; *see also* Hearing Exhibits 240-241; 243-245 and 321, attached hereto as Exhs. E - J; LMC Exh. 10 at 8-9, 14-15.)  Such evidence is consistent with the contract's "follow the settlements" provision explained by Ms. Harnadek and argued by counsel. (*See* Exh. D hereto at 116:24-117:12.)  Indeed, as evidence showed, the reinsurers' obligations were triggered upon a "statement of claims paid and salvages recovered."  (*See id.* 118:11-21.) Century's counsel, Thomas Allen, captured as much when he argued that LMR's payment is due on billing – not subject to LMR's approval, audit or RDR compliance.  (*See id.* at 28:16-31:18.) Ms. Harnadek gave concrete examples of how LMR used the RDRs and other tactics to avoid payment of even the most solidly reported losses.  (*Id.* at 181:23-212:14; 235:14-244:6.)[8]  Thus, the Panel was well-furnished with evidence of contractual intent that money flow promptly to Century for all claims presented to LMR, including the historical practice of advancing funds and pre-funding billings while disputes were pending.[9]  Likewise, the Panel heard persuasive evidence that a return to such a practice was necessary to restore equity to a badly damaged relationship and ensure Century the benefit of its bargain.

---

[8] Another Century witness testified about the high quality and professionalism of Century's asbestos claims-handling.  S*ee, e.g.,* October 18, 2006 Hearing Transcript, Exh. K hereto at 777:10-784:23; 813:23-820:4 (Testimony of D. Brehm, Chief Claims Officer).

[9] This intent is consistent with treaty reinsurance relationships generally:

> In its simplest terms, the reinsurer intends to assume risk for the purpose of making a profit, and the ceding insurer intends to be indemnified in respect of loss when it happens.  Neither party may mislead or baulk the other in the legitimate realization of these goals . . .

*See The Nature of Reinsurance* in REINSURANCE (Robert W. Strain ed.), *supra*, at 9.

6876008v.4

### 3.   The Arbitration Panels' Awards.

#### a.   The Hunter Panel Phase 1A Award.

The Hunter Panel decided the issues presented to it in Phase 1A in Century's favor.  The award, LMC Exh. 14, represents a thoughtful and considered judgment on the issues submitted to arbitration.  Specifically, the Hunter Panel noted that, in recent years, the relationship between the parties had broken down and steadily deteriorated such that piecemeal "account specific" arbitrations "clearly [had] not yielded a resolution of the disputes before [the] Panel."  (*Id.* at 2.) The Hunter Panel went on to state that it was of the view that it had the authority to grant the relief provided for in its award and that:

> [I]n doing so it is in no measure rewriting the contract but simply articulating how the contract operates under the present circumstances . . . .  The relief provided herein is squarely grounded in the contract, and is ordered out of a keen desire to assist the parties to get their long standing relationship back on track.

(*Id.* at 2-3.)  To that end, the Panel directed LMR and Century, among other things, to reconcile past due amounts and to comply with a Protocol (Exhibit "A" to the award) for the handling of future asbestos claims.  (*Id.* at 3.)  The Protocol provided, among other things, that LMR must pay 100% of undisputed amounts and 75% of disputed amounts (as a good faith "on account" payment) within 106 days of Century's billings.  (*Id.* at Exhibit "A," Protocol, ¶¶ 5, 6.)

Both the 106-day period and the 75% payment "on account" concepts were rooted in the contract and the parties' prior course of dealing.  As explained by the Hunter Panel (in note 1 to the Protocol) the 106-day period was based on Article IX of the Treaty which provided that LMR must pay all amounts due within 75 days.  The Panel determined that a reasonable way to effect the Treaty under the current circumstances was to give LMR the benefit of a month-long period for receipt and analysis of any billings before the 75-day period would begin to run.  (*See id.*, Exhibit "A," at note 1.)  The 75% payment provision, similarly, had its genesis in evidence of the contractual intent and purpose of the treaty – that money flow promptly to the ceding company

-9-

for the payment of claims – and the parties' prior course of dealing in effecting that purpose, particularly the "OCAs."

In light of the upcoming Phase 1B and Phase II hearings, and in order to make sure that the Phase 1A Protocol would be workable for the parties, the Hunter Panel retained jurisdiction "over the issues raised by the arbitration demand, including issues or controversies arising out of the Protocol . . . ." (*Id.* at 4.) The Panel reserved to itself the right to amend the Protocol within 180 days (or thereafter upon application of either of the parties). (*Id.*) Significantly, the Hunter Panel's award was unanimous.

The Protocol proved to operate effectively and was not modified by the Panel. Nor did any of the parties affected by the Hunter Panel's award seek its modification as permitted by the Order. After 3 years, by order dated July 7, 2010, the Hunter Panel relinquished jurisdiction. (*See* Exh. L hereto.) No party to the award ever sought to have it vacated.

### b. The Powers Panel's Award.

On December 10, 2006, following the Hunter Panel hearing and its own deliberations, the Powers Panel issued the award which is the subject of the current petition to vacate. (*See* LMC Exh. 13.) The Powers Panel adopted the Hunter Panel's award[10] except as modified in certain limited ways. The Panel considered that it had the authority to grant the relief provided in response to the arbitral disputes presented to it, and that its award "effect[ed] the general purpose of the parties' agreement in a reasonable manner." (*Id.* at ¶ 1.) It ordered the payment of past due claims and adopted a Protocol identical to that adopted by the Hunter Panel for the payment of future claims. (*Id.* at ¶ 3 (and Exh. "A" thereto).) The Powers Panel expressly recognized that the version of Treaty 101 relevant to it did not contain a "Reports and Remittances" clause or

---

[10] Unlike the unanimous result obtained by the Hunter Panel, in the instant case LMR's party-appointed arbitrator, James Powers, dissented to the Panel's award.

any specific wording as to due dates for the payment of claims but determined, in light of all of

the evidence presented, including the treaty wordings overall, the operation of the OCAs for all

treaty periods,[11] and the specific Treaty 101 contract wording relevant to it, that the Protocol

represented a reasonable interpretation of LMR's payment obligations under the Treaty wording.

(*Id.* Exhibit "A," at note 1.)

Different from the Hunter Panel, however, while the Powers Panel did "retain jurisdiction

over the issues raised by the arbitration demand, including issues or controversies arising out of

the Protocol," it did not purport to retain any ability to change the terms of its award.  The

Panel's retention of jurisdiction was stated to last until the Panel, by its own motion, or pursuant

to a motion by one or both of the parties, deemed that a relinquishment of jurisdiction was

appropriate.  (*Id.* at ¶ 6).[12]

### 4.    Operation of the Powers Panel's December 10, 2006 Award and the Panel's Subsequent Relinquishment of Jurisdiction.

The parties operated under the Powers Panel's Phase IA award, submitting and paying

asbestos claims with no substantial disagreements or delays for almost four years.[13]  In other

words, the Protocol worked.  During that time, no party ever challenged the general application

of the Protocol, and they fell into a course of dealing operating effectively thereunder.  Likewise,

LMC did not at any time ask the Panel to reform, rescind or modify the award.  Finally, LMC did

---

[11] Although the version of Treaty 101 covering the period of time relevant hereto did not contain a "Reports and Remittances" clause, the OCAs were used for claims under that period of the Treaty as well. (*See* Exh. D hereto at 124:21-125:11, 131:18-136-9 (Testimony of J. Harnadek); *see also* hearing exhibits 240-241; 243-245 and 321, attached hereto as Exhs. E – J.)

[12] The Powers Panel issued its awards on Phase 1B and on Phase II on February 7, 2007 and April 30, 2007, respectively.

[13] This contrasts with the 9 account-specific arbitrations regarding the payment of asbestos bodily-injury claims that were commenced in the four years prior to the December 10, 2006 award and the (at least) twenty-nine (29) policyholder accounts on which there were disputes affecting payment of asbestos bodily-injury claims at the time the RDR arbitration was held.  (*See* LMC Exh. 7 at 79-85; *see also* December 10, 2006 Award, LMC Exh. 13 at ¶ 4.)

not at any time during that (almost) four year period ask the Panel to recharacterize its Order as "final," to relinquish its jurisdiction, or to take any other action which, in LMC's view, might have been required for them to petition this Court to vacate the award.

On May 10, 2010, the Powers Panel communicated with Century and LMR as follows:

> Inasmuch as none of the parties have needed guidance from the Panel in a considerable time, we question whether it is necessary or appropriate for the Panel to continue further jurisdiction in this matter. We would like to hear the parties' views on the subject by June 1, 2010.

(*See* May 10, 2010 E-mail from E. Thompson to C. Russell *et al*., LMC Exh. 15.)  In response to this request, Century and all LMR *except* the LMC making this petition, agreed that it was appropriate for the Panel to relinquish jurisdiction and to enter an order which modified the prior order only to state the obvious – that since the Panel would no longer have jurisdiction, any disputes under the Protocol would have to be resolved in a new arbitration pursuant to the terms of the Treaty (as opposed to being referred back to the Powers Panel).  (*See* LMC Exh. 17.)  The December 10, 2006 award would remain the same in all other respects.  (*Id.*)  LMC, however, sought to have the Panel effectively vacate its own award.  (*See* LMC Exh. 16.)  Their idea was that the Panel should relinquish jurisdiction without "converting" the December 10, 2006 award into a "final" award, apparently on the theory that the "interim" award would no longer have any force or effect whatsoever.  Alternatively, LMR argued that, if the December 10, 2006 order were to be continued in effect, it should be amended to remove the provision of the Protocol that required LMR to pay on account 75% of disputed claims pending resolution.  (*Id.* at 5-8.)

Century opposed this request, arguing that the "Interim Order" had been determined by the Panel at the time it was entered to be a reasonable interpretation of the contract, effecting its general purpose, and that merely by terminating its jurisdiction, the Panel would not turn what it had recognized as an award grounded in the terms of the contract into one that was extra-contractual.  (*See* June 8, 2010 Letter from C. Russell to E. Thompson, *et al*, LMC Exh. 18.)

-12-

Accordingly, Century requested the Panel to terminate its jurisdiction but, otherwise, to leave its December 10, 2006 award unchanged.[14] (*Id.* at 4.)

After considering the arguments of the parties, on July 15, 2010, a majority of the Powers Panel entered and delivered its "Final Order," which preserved in full force and effect the prior award (subject to making a ministerial change to note that any further disputes would require a new arbitration panel) and relinquished its jurisdiction. (*See* July 15, 2010 Order, LMC Exh. 20.) LMC's petition to vacate followed 91 days later.

III.   **ARGUMENT**

   A.   **LMC'S Petition to Vacate Was Not Timely Filed.**

   LMC assert that their petition to vacate is filed under the Federal Arbitration Act, 9 U.S.C. §1, *et. seq.* (the "FAA").[15] While LMC rely on the FAA, it appears that New York procedural law should apply. As noted at Part II.A., *supra*, the relevant Treaty 101 wording references the application of "the arbitration law of New York State." The determination whether FAA or state law applies in the circumstance where the contract contains a choice of law clause can be a torturous one. It is clear, however, that there is no federal policy favoring arbitration under a certain set of rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate. *See Security Ins. Co. of Hartford v. TIG Ins. Co.*, 360 F.3d 322, 325 (2d Cir. 2004) *quoting Volt Information Sciences, Inc. v. Board*

---

[14] Century also explained that, if LMC were now taking the position that the Powers Panel exceeded its authority, LMC's time to challenge the award on that basis had long since expired. (*Id.* at note 2.)

[15] While it appears that LMC are relying exclusively on Chapter 1 of the FAA, to the extent federal law applies, LMC's Petition to Vacate actually should have been brought pursuant to Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201-208, which provides for the enforcement of the Convention on Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958. Because the arbitration award at issue arises out of a commercial relationship not entirely between citizens of the United States, it falls under the Convention. *See* 9 U.S.C. § 202. The applicability of Chapter 2, however, does not impact the analysis of LMC's Petition under the FAA's vacatur standards; the extremely limited scope of review and the petitioner's heavy burden to establish grounds for vacatur under 9 U.S.C. § 10 still apply. *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22-23 (2d Cir. 1997).

6876008v.4

*of Trustees,* 489 U.S. 468, 476 (1989).  The FAA "requires arbitration proceed *in the manner provided for in the parties agreement." See id. at 325, quoting Volt* 489 U.S. at 475 (emphasis in original).  The Treaty 101 wording calling for the application of New York arbitration law, therefore, would presumptively apply to LMC's Petition.  Indeed, when it served their purposes during the course of the arbitration, LMC argued that New York arbitration law applies to the enforcement of this contract.  (*See* LMC Phase 1B Pre-Hearing Brief of Respondents Harper Insurance Company and River Thames Insurance Company, Exh. M hereto, at 27-28.)  While Century disagreed – and still does – with the breadth of the application of New York law argued for by LMC, Century agreed that "the arbitration law of New York State" was intended to refer to New York's Civil Practice Law and Rules ("CPLR") § 7500, *et seq.*  (*See* Century's Supplemental 1B Brief, Exh. N hereto at 50-54.)  Regardless of whether New York law or the FAA applies, however, LMC are out of time.

      1.     **LMC Did Not File Their Petition to Vacate Within Ninety Days of the Date the Award Was Delivered, As Required by New York Law.**

      Under New York arbitration law, a petition to vacate must be filed within ninety (90) days from the date the award was delivered.  N.Y.C.P.L.R. § 7511(a).  Section 7511(a) has been construed strictly against late filers.  *See Local 802 v. Parker Meridien Hotel*, 145 F.3d 85 (2d. Cir. 1998) (applying N.Y.C.P.L.R. §7511(a) to reject defense to confirmation not filed before 90 day window elapsed); *see also Hakala v. J.P. Morgan Securities, Inc.*, 2006 WL 1788962 (2d Cir. 2006) (affirming district court's reading of §7511(a) which dismissed as untimely a pro-se petition to vacate filed on the 91st day following receipt of an arbitration award.)  The Powers Panel issued its Phase 1A award on December 10, 2006.  LMC argue that the Phase 1A Award was not final, and that LMC could not file a petition to vacate, until the Panel entered its July 15, 2010 award.  Even if the Court accepts LMC's position, however, LMC are time-barred under New York law.  The July 15, 2010 award was delivered by e-mail on July 15, 2010.  (*See* LMC

-14-

Exh. 20.)  Ninety days from that date is October 13, 2010.  LMC's petition was not filed until
October 14, 2010.  (*See* Time-Stamped Civil Cover Sheet, Exh. O hereto.)  Accordingly, if New
York arbitration law is applied, LMC's petition must be denied as out of time.[16]

### 2.  LMC's Petition to Vacate Was Not Timely Filed Even if Governed by the FAA.

A petition to vacate, in order to be timely filed under the FAA, must be served on the
opposing party within three months of the delivery of the award.  9 U.S.C. §12.  The three-month
window provided by the FAA is intentionally short.  It is intended to promote the speedy
resolution of arbitral disputes.  *See McCelland v. A. Z. Rilyan,* 31 F. Supp. 2d 707, 712 (W.D.
Mo 1998); *Florasynth Inc. v. Pickholz,* 750 F.2d 171, 176-77 (2d. Cir. 1984).  "The role of
arbitration as a mechanism for speedy dispute resolution disfavors delayed challenges to the
validity of an award."  *Id.* at 177.  Missing the three-month deadline by even one day has
resulted in such motions being denied.  *See, e.g., R&Q Reinsurance Co. v. American Motorist
Insurance Co., et al.,* 2010 WL 4052178, *3-4 (N.D. Ill. Oct. 14, 2010) (slip opinion).  The
question, then, is when that three months should begin to run.  LMC argue that:  "Being 'interim'
in nature and not a final award deciding all issues in dispute the [December 10, 2006] Order
could not be challenged under Section 10 of the FAA."  (LMC Brief at 11.)

If one followed LMC's argument (that they could not seek judicial relief from the
December 10, 2006 award simply because it was titled an "Interim Order" and the Panel had
retained jurisdiction) to its logical conclusion, it would mean that LMC would have been subject
to what they claim was an award so unjust as to "violate fundamental notions of fairness and due
process" LMC Brief at 1), indefinitely and with no recourse.  Nothing, of course, could be
further from the truth.  LMC had several avenues available to them to obtain redress if the award

---

[16] LMC's late filing is particularly inexcusable under the present circumstances in which LMC allege that
they had been waiting for almost four years for the opportunity to file their Petition to Vacate.

6876008v.4

was, in fact, as violative of due process as they maintain. LMC could have requested the Panel to re-title its award as a "Final Award." If LMC believed the Panel's retention of jurisdiction prevented them from challenging the award, they could have, at any time after the award, requested the Panel relinquish jurisdiction. If the Panel denied LMC's requests, LMC could have (and should have), filed an immediate petition to vacate on the basis that the Panel's retention of jurisdiction exceeded its authority. Indeed, Section 10(a)(4) of the FAA specifically provides that a party may petition a court for relief – within three months – if it believes an arbitration Panel exceeded its authority in that it failed to issue a "final and definite" award on the issues presented. LMC, however, did none of these things. Instead, LMC operated under the Protocol for almost four years, with no complaint, no effort toward further Panel intervention and no effort to resort to this Court for relief.

Plainly, LMC are out of time under either the three-month period prescribed by the FAA, or the 90 day period under New York law.[17] Accordingly, LMC's petition to vacate must be dismissed as time-barred.

**B.  The Powers Panel's Award Represents a Proper Exercise of the Panel's Authority and is not Subject to Vacatur Under § 10(a)(4) of the FAA or New York Arbitration Law.**

      **1.  This Court Must Accord Great Deference to the Powers Panel's Decision.**

Even if the court determines that LMC's petition was timely filed, it must be denied because LMC have not established a basis for vacatur under either the FAA or New York law. Under the FAA, an arbitrator's decision is entitled to "great deference," and a party seeking vacatur "bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law" to achieve that result. *Duferco Int'l Steel*

---

[17] LMC's conduct also operates as a waiver or estoppel such that LMC's petition should not be countenanced by this Court. It is simply unconscionable for LMC to sit on its hands for almost four years before attempting to change the result of the arbitration.

-16-

*Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003). Indeed, as a general matter, courts in this Circuit have considered themselves required to enforce arbitration awards so long as there is a "barely colorable justification for the outcome reached." *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003) (citation and quotation omitted). Even clear error is not grounds for relief so long as the award draws its essence from the contract. *See ReliaStar Life Ins. Co. of New York v. EMC Nat'l Life Co.*, 564 F.3d 81, 85-86 (2d Cir. 2009) ("as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," a court's conviction that the arbitrator has "committed serious error" in resolving the disputed issue "does not suffice to overturn his decision") (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).[18]

This Court is required to "accord[ ] the narrowest of readings" to its authorization to vacate awards pursuant to section 10(a)(4).[19] *See Banco de Seguros del Estado*, 344 F.3d at 262 (quoting *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 220 (2d Cir. 2002)). In determining whether the decision of an arbitration panel should be vacated on the basis of section 10(a)(4), the court must determine "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *Id.* Likewise, arbitrators have broad discretion to

---

[18] The law of other circuits is in accord. *See, e.g., Mut. Fire, Marine & Inland Ins. Co. v. Norad Reins. Co.*, 868 F.2d 52, 56 (3d Cir. 1989) (court's function in confirming or vacating award "severely limited[,]" court does not disturb the award unless its terms are "completely irrational"); *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995) (for a court to deny enforcement of an award, "there must be absolutely no support at all in the record justifying the arbitrator's determinations[;]" "[it] should be clear that the test used to probe the validity of a[n] . . . arbitrator's decision is a singularly undemanding one"); *Prostyakov v. Masco Corp.*, 513 F.3d 716, 723 (7th Cir. 2008) (court will uphold arbitral award unless there is no possible interpretive route to it); *Glover v. IBP, Inc.*, 334 F.3d 471, 474 (5th Cir. 2003) (where agreement gives arbitrator authority to interpret contract, award must be enforced so long as rationally derived from either letter or purpose of agreement).

[19] 9 U.S.C. §10 (a) (4) permits vacation "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

6876008v.4

determine an appropriate remedy so long as they do not exceed the power granted to them by the contract itself. *Id.* at 262. Thus, where the contract contains a broad arbitration clause, "arbitrators have the discretion to order such remedies as they deem appropriate." *Reliastar*, 564 F.3d at 86.

New York law, similarly, mandates "extremely limited" judicial review of arbitration proceedings and requires that great deference be given to awards rendered in arbitration.[20] *See Brown & Williamson Tobacco Corp. v. Chesley*, 777 N.Y.S.2d 82, 86-87 (N.Y. App. Div. 2004). In reviewing an award, a court is bound by the arbitrator's factual findings and interpretations of the contract. *See Matter of New York State Correctional Officers & Police Benevolent Assn. v. State of New York*, 726 N.E.2d 462, 465 (N.Y. 1999). A court cannot examine the merits of an arbitration award and substitute its judgment for that of the arbitrator simply because it believes its interpretation would be the better one. *Id.* An award will not be vacated "unless it is violative of a strong public policy, or is totally irrational, or exceeds a specifically enumerated limitation on his power." *Matter of Silverman [Benmor Coats]*, 461 N.E.2d 1261, 1266 (N.Y. 1984).

The power of arbitrators is assumed to be broad: unless the agreement provides to the contrary, "an arbitrator is not bound by principles of substantive law or by rules of evidence but may do justice as he sees it, applying his own sense of law and equity to the facts as he finds them to be." *Azrielant v. Azrielant*, 301 A.D.2d 269, 275 (N.Y. App. Div. 2002), quoting *Matter of Silverman*, 461 N.E.2d at 1266. As long as arbitrators act within their jurisdiction, their

---

[20] N.Y. C.P.L.R. § 7511 (b)(1)(iii) provides:

**(b) Grounds for vacating.**

1. The award shall be vacated on the application of a party who either participated in the arbitration or was served with a notice of intention to arbitrate if the court finds that the rights of that party were prejudiced by:
   ***
   (iii) an arbitrator, or agency or person making the award exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made . . . .

-18-

awards will not be set aside because they have erred in judgment either upon the facts or the law. *Goldfinger v. Lisker,* 500 N.E.2d 857, 859 (N.Y. 1986).  In short, an arbitration award cannot be vacated if there exists any plausible basis for it.  *Azrielant,* 301 A.D.2d at 275.

>       2.    **LMC Cannot Meet Their Heavy Burden to Prove a Basis for Vacatur Under Either the FAA or New York Law.**

LMC argue that the Powers Panel exceeded its authority by entering an award which called for LMC to make 75% payment of disputed asbestos claims in accordance with the Protocol adopted by the Panel.  LMC make two arguments in this regard:  (1) that the 75% payment obligation represents relief which neither party specifically requested (and therefore is outside the Panel's authority) (LMC Brief at 19-21); and (2) the specific relief accorded amounted to the Panel "rewriting" the reinsurance contract (LMC Brief at 15-19).  Neither of these assertions can withstand scrutiny.

>       a.    **The question of how and when money should flow from LMC to Century was squarely before the panel.**

LMC's first argument is flawed because LMC take far too narrow a view of what constitutes a dispute submitted to the Panel.  The Treaty contains a broad arbitration clause requiring the submission of any dispute "in connection with the Agreement . . . ." (Treaty 101, LMC Exh. 1, at Art. XII.)  Squarely before the Panel, as discussed above at Part II.C.2, was the question of when LMC were required to pay Century's asbestos billings – did LMR have to pay 100% of Century's billings immediately upon receipt or could LMR (as they had been doing) withhold indefinitely any payments while they conducted duplicative and time-consuming "inspections of records" and raised vague defenses to payment based on the RDRs.  Front and center throughout the proceedings was the question of, "who gets to hold the money" in the face of a dispute.  Century argued, backed by Treaty language and evidence of the parties' prior course of dealing, that LMC's payment obligation attached when it received a statement of

-19-

claim, not (as LMC argued) only when LMC had had a chance to audit files and determine compliance with their RDRs.  (*See, e.g.*, Century's Pre-Hearing Brief, LMC Exh. 10, at 5-18; Exhs. E – J hereto, Exh. D at 28:16-31:18, 124:21-125:11, 131:18-136:9.)  Plainly, this was a dispute "in connection with the Agreement" and was properly submitted to the Panel for decision.

    LMC's argument that the court should vacate the award because Century did not request the specific *remedy* fashioned by the Panel has an even more fundamental flaw.  In order to succeed, LMC must take the position that they are moving to vacate the July 15, 2010 Order – otherwise, they are time-barred, even under the FAA.  But it is indisputable that Century specifically requested the relief represented by the Protocol prior to the Panel's entry of its July 15, 2010 award.  (*See* June 1, 2010 Letter from C. Russell to E. Thompson et al., LMC Exh. 17 (attaching proposed order releasing jurisdiction but otherwise leaving December 10, 2006 order and protocol in place and undisturbed); June 8, 2010 Letter from C. Russell to E. Thompson et al., LMC Exh. 18 (requesting panel leave protocol and 75% payment provision in place if panel released jurisdiction, and opposing LMC's request for change in panel's remedy).  LMC's argument that this somehow does not "count" (*see* LMC Brief at 21-22) simply makes no sense.  Either LMC's current motion is time-barred if based on the December 2006 award, or, if based on the July 15, 2010 award, Century specifically requested the relief awarded prior to its entry.

    **b.    The Powers Panel reasonably interpreted Treaty 101 and fashioned a remedy to effect its general purpose.**

    LMC's second argument must fail because the panel did not "rewrite" the contract – it simply interpreted the contract and fashioned a remedy that would "effect [ ] the general purpose of [the] Agreement in a reasonable manner . . . ."  (Treaty 101, LMC Exh. 1, at Art. XII), as it was contractually required to do.  While it is not within the purview of the court to conduct a *de*

-20-

*novo* review of the evidence, from even the few examples discussed herein (extracted from a record including 1600 pages and over 300 exhibits), it is obvious that there was ample support for the remedy that the Powers Panel chose. Treaty 101 requires LMR to "pay or allow" their proportion of all claims payments made by Century. (*Id.* at Art. VIII.) Unlike some of the Treaty 101 wordings for other time periods, it did not expressly state when that payment should be made. Nor did it provide any express provisions (one way or the other) about what payments were due pending the resolution of any disputes. The Panel, then, was left to interpret the existing treaty wording. They did so by looking to how the Treaty was intended to operate, to the other wordings that comprised the Treaty 101 program as a whole, and to the course of dealing between the parties evidenced by the "OCAs." (*See, e.g.,* Exh. D hereto at 124:21-125:11, 131:18-136:9, Exhs. E – J hereto; LMC Exh. 10 at 8-9, 14-15; LMC Exh. 10 at 8-9, 14-15.) Thus, the implementation of the Protocol as the means by which to resolve the parties' dispute clearly was within the Panel's broad discretion to fashion an appropriate remedy and was well-grounded in the contract itself.

LMC rely almost exclusively on *PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd,* 659 F. Supp. 2d 631 (E.D. Pa. 2009), *aff'd,* 2010 WL 4409655 (3d Cir. Nov. 8, 2010), for its proposal that the Powers Panel's award must be vacated. That reliance, however, is misplaced. In *PMA Capital,* the court applied a high threshold for vacatur that equates to the standards applicable in this Court.[21] Under the facts of *PMA Capital,* however, the court determined that the (exceedingly rare) remedy of vacatur was appropriate. There, the arbitration panel had been asked to render a declaratory decision – to determine how a "deficit carry forward" provision in the contract should operate with respect to losses under a particular

---

[21] *See PMA Capital,* 659 F.2d at 635 (court's function in confirming or vacating an arbitral award is severely limited; vacation of an award is appropriate only if terms of award are "completely irrational" and cannot be rationally derived either from the parties' submissions or from the agreement).

6876008v.4

contract. *Id.* at 634.  Instead of doing so, however, the Panel issued an award which:  (1) required the immediate payment of $600 million (despite the fact that the parties agreed that certain preconditions for the payment of money had not been met); and (2) *entirely deleted* the deficit carry forward provision from the agreement.  *Id.*  Broad discretion notwithstanding, to ignore the agreed-upon pre-conditions for payment and to entirely eliminate a provision from the contract, the Court concluded, was impermissible.  *Id.* at 639.

Applying the proper deferential standard (as set out in, *e.g., Reliastar, PMA Capital* and relevant New York law), and contrasting the *PMA Capital* facts with those presented here, there can be no doubt that the Panel in this matter confined itself to deciding the issues submitted by the parties and rendered a reasonable interpretation of the contract as applied to the dispute.  Here, rather than removing a provision of the contract, the Panel reasonably interpreted the payment obligation that was found in the contract and, as requested by Century, addressed the interplay of how and when payments were required in light of LMRs' audit rights and possible disputes regarding future claims.  The Panel's decision was rational, reasonable, drew its essence from the contract *and it worked.*  Even LMC do not dispute that.[22]  Accordingly, there is no basis for the Panel's award to be vacated.

## IV.   CENTURY'S CROSS-MOTION FOR CONFIRMATION PURSUANT TO 9 U.S.C. § 207

If New York procedural law regarding arbitrations governs this petition, then, upon denying LMC's Petition to Vacate, the court must confirm the award.  *See* N.Y.C.P.L.R. § 7511(e) ("upon the denial of a motion to vacate or modify, [the Court] shall confirm the

---

[22] LMC's argument that the Protocol prevents them from denying any improper claim and leaves them without a remedy in the event that Century submits one (*see* LMC Brief at 2), is baseless.  First, none of the hearing evidence even remotely suggested that Century had ever submitted claims in bad faith.  To suggest that Century would do so now simply because the Protocol exists is offensive.  But more importantly, LMC still have the contractual remedy that they bargained for – the right to arbitrate disputed claims.  The Protocol simply makes clear that Century (and not LMC) are entitled to "hold the money" (or at least 75% of it) while any such dispute is being resolved.

award"). If the Court determines that the FAA applies, however, Century's cross-motion for confirmation is governed by the three-year statute of limitations found in Chapter 2 of the FAA and must be confirmed. *See* U.S.C. § 207; *see also Hall Street Associates, LLC v. Mattel, Inc.*, 128 S. Ct. 1396, 1405 (2008) ("on application for an order confirming the arbitration award, the court 'must grant' the order unless the award is vacated . . . as prescribed in sections 10 and 11 of [the FAA]"). For all of the same reasons (set forth above) that LMC's petition to vacate should be denied, Century's cross-motion to confirm the award should be granted.

## V.    CONCLUSION

The Powers Panel's July 15, 2010 Award was a final decision regarding the matters submitted to it, drew its essence from the contract, and represented a reasonable means of effecting the contract in the circumstances of the dispute. LMC's petition to vacate must be dismissed because it is time-barred and because LMC have not demonstrated a substantive basis for vacatur under 9 U.S.C. §10(a)(4). For the same reasons that LMC's petition for vacatur cannot succeed under the provisions of Section 10(a)(4), Century's counter-petition to confirm must be granted.

Respectfully submitted,

WHITE AND WILLIAMS LLP

By:

Andrew I. Hamelsky, Esquire
Christine G. Russell, Esquire
Ellen K. Burrows, Esquire
Brendan D. McQuiggan, Esquire
One Penn Plaza
41st Floor, Suite 4110
New York, NY 10119
212.631.4406

Dated: November 17, 2010

-23-

## CERTIFICATE OF SERVICE

I, Andrew I. Hamelsky, hereby certify that I caused to be served a true and correct copy of Century Indemnity Company's Response to Harper Insurance Limited's Petition to Vacate and Alternate Counter-Petition to Confirm Award, memorandum of law in support thereof with exhibits, and form of order, this 17th day of November, 2010, by electronic mail and United States mail upon the following counsel for Respondents:

> Brian E. O'Donnell
> Caroline Brizzolara
> John R. Vales
> Riker Danzig Scherer Hyland & Perretti LLP
> Headquarters Plaza
> One Speedwell Avenue
> Morristown, New Jersey 07962-1981
> 973.538.0800

Respectfully submitted,
**WHITE AND WILLIAMS LLP**

Andrew I. Hamelsky
One Penn Plaza
Suite 4110
New York, NY 10119
212-244-9500

Dated: November 17, 2010

6946636v.1