CONFIDENTIAL MATERIALS

HARPER INSURANCE LIMITED, RIVER THAMES INSURANCE COMPANY LIMITED and GUILDHALL INSURANCE COMPANY LIMITED,

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
NEW YORK

                                      Petitioners,

Case Action No.

        vs.

Hon.

CENTURY INDEMNITY COMPANY,

                                      Respondent.

---

**MEMORANDUM OF LAW IN SUPPORT OF
PETITION TO VACATE ARBITRATION AWARD**

RIKER DANZIG SCHERER HYLAND &
    PERRETTI LLP
500 Fifth Avenue, Suite 4920
New York, New York 10110
(212) 302-6574
            -- and --
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Petitioners, Harper Insurance Limited, River Thames Insurance Company Limited and Guildhall Insurance Company Limited

Of Counsel and on the Brief:
    Brian E. O'Donnell
    Federal Bar No. BO-7458

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ............................................................................................3

    A.    TREATY 101 ................................................................................3

    B.    THE ARBITRATION ....................................................................4

        1.    CENTURY'S ARGUMENTS ............................................7

        2.    REINSURERS' ARGUMENTS ..........................................8

    C.    THE INTERIM ORDER .................................................................9

        1.    THE PRE-PAYMENT PROVISION AND THE POWERS
PANEL'S RETENTION OF JURISDICTION .........................9

        2.    MR. POWERS' DISSENT TO THE INTERIM ORDER ........................10

    D.    SUBSEQUENT EVENTS ................................................................11

    E.    THE FINAL ORDER .....................................................................13

LEGAL ARGUMENT .................................................................................................14

POINT I ....................................................................................................................15

THE POWERS PANEL EXCEEDED ITS POWERS BY AWARDING EXTRA-
CONTRACTUAL RELIEF THAT RE-WRITES MATERIAL TERMS OF
TREATY 101 .............................................................................................................15

POINT II ...................................................................................................................19

THE POWERS PANEL EXCEEDED ITS POWERS BY ORDERING RELIEF
THAT NEITHER PARTY REQUESTED, ON WHICH NO EVIDENCE OR
TESTIMONY WAS EVER SUBMITTED .......................................................................19

POINT III ..................................................................................................................21

POST-HEARING ARGUMENT IS NOT "EVIDENCE" ON AN ISSUE THE
PARTIES PREVIOUSLY AGREED TO SUBMIT TO THE ARBITRATORS
FOR RESOLUTION .....................................................................................................21

CONCLUSION ...........................................................................................................23

# TABLE OF AUTHORITIES

## CASES

Matter of Andros Compania Maritima, S.A. of Kissavos (Marc Rich & Co., A.G.),
        579 F.2d 691 (2d Cir.1978)..................................................................................19

Ashraf v. Rep. N.Y. Secs. Corp.,
        14 F. Supp. 2d 461 (S.D.N.Y. 1998)................................................................20

Banco de Seguros del Estado v. Mut. Marine Office, Inc.,
        344 F.3d 255 (2d Cir. 2003)............................................................................19

Collins & Aikman Floor Coverings Corp. v. Froehlich,
        736 F. Supp. 480 (S.D.N.Y. 1990) ............................................................16, 20

E.B. Michaels v. Mariforum Shipping, S.A.

| | |
|---|---|
| HARPER INSURANCE LIMITED, RIVER THAMES INSURANCE COMPANY LIMITED and GUILDHALL INSURANCE COMPANY LIMITED, | CONFIDENTIAL MATERIALS <br><br> UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK |
| Petitioners, <br><br> vs. <br><br> CENTURY INDEMNITY COMPANY, <br><br> Respondent. | Case Action No. **JUDGE BUCHWALD** <br><br> Hon. |

---

**MEMORANDUM OF LAW IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD**

RECEIVED
OCT 14 2010
U.S.D.C. S.D. N.Y.
CASHIERS

RIKER DANZIG SCHERER HYLAND
  PERRETTI LLP
500 Fifth Avenue, Suite 4920
New York, New York 10110
(212) 302-6574
         -- and --
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Petitioners, Harper Insurance Limited, River Thames Insurance Company Limited and Guildhall Insurance Company Limited

Of Counsel and on the Brief:
  Brian E. O'Donnell
  Federal Bar No. BO-7458

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS ...................................................................................3

    A.    TREATY 101 ......................................................................................3

    B.    THE ARBITRATION ...........................................................................4

              1.    CENTURY'S ARGUMENTS ...............................................7

              2.    REINSURERS' ARGUMENTS ............................................8

    C.    THE INTERIM ORDER ......................................................................9

              1.    THE PRE-PAYMENT PROVISION AND THE POWERS PANEL'S RETENTION OF JURISDICTION ...........................9

              2.    MR. POWERS' DISSENT TO THE INTERIM ORDER ........................10

    D.    SUBSEQUENT EVENTS ......................................................................11

    E.    THE FINAL ORDER .........................................................................13

LEGAL ARGUMENT ........................................................................................14

POINT I ........................................................................................................15

THE POWERS PANEL EXCEEDED ITS POWERS BY AWARDING EXTRA-CONTRACTUAL RELIEF THAT RE-WRITES MATERIAL TERMS OF TREATY 101 ...................................................................................................15

POINT II ........................................................................................................19

THE POWERS PANEL EXCEEDED ITS POWERS BY ORDERING RELIEF THAT NEITHER PARTY REQUESTED, ON WHICH NO EVIDENCE OR TESTIMONY WAS EVER SUBMITTED ...................................................................19

POINT III ........................................................................................................21

POST-HEARING ARGUMENT IS NOT "EVIDENCE" ON AN ISSUE THE PARTIES PREVIOUSLY AGREED TO SUBMIT TO THE ARBITRATORS FOR RESOLUTION ............................................................................................21

CONCLUSION ................................................................................................23

## TABLE OF AUTHORITIES

### CASES

Matter of Andros Compania Maritima, S.A. of Kissavos (Marc Rich & Co., A.G.),
    579 F.2d 691 (2d Cir.1978)................................................................................19

Ashraf v. Rep. N.Y. Secs. Corp.,
    14 F. Supp. 2d 461 (S.D.N.Y. 1998)..............................................................20

Banco de Seguros del Estado v. Mut. Marine Office, Inc.,
    344 F.3d 255 (2d Cir. 2003).............................................................................19

Collins & Aikman Floor Coverings Corp. v. Froehlich,
    736 F. Supp. 480 (S.D.N.Y. 1990) ..........................................................16, 20

E.B. Michaels v. Mariforum Shipping, S.A.,
    624 F.2d 411 (2d Cir. 1980).............................................................................21

First Options of Chicago, Inc. v. Kaplan,
    514 U.S. 938 (1995)..........................................................................................19

Hall Street Assocs., L.L.C. v. Mattel, Inc.,
    128 S. Ct. 1396 (2008).....................................................................................21

Melun Indus., Inc. v. Strange,
    898 F. Supp. 990 (S.D.N.Y. 1990) .................................................................20

PMA Cap. Ins. Co. v. Platinum Underwriters Bermuda, Ltd.,
    659 F. Supp. 2d 631 (E.D. Pa. 2009) .......................................................17, 18

PaineWebber Inc. v. Bybyk,
    81 F.3d 1193 (2d Cir. 1996)............................................................................15

Patten v. Signator Ins. Agency, Inc.,
    441 F.3d 230 (4th Cir. 2006) ..........................................................................16

ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.,
    564 F.3d 81 (2d Cir. 2009)..............................................................................15

Synergy Gas Co. v. Sasso,
    853 F.2d 59 (2d Cir. 1988)..............................................................................15

Torrington Co. v. Metal Prods. Workers Union Local 1645,
    362 F.2d 677 (2d Cir. 1966)............................................................................16

Totem Marine Tug & Barge, Inc. v. N. Am. Towing Inc.,
    607 F.2d 649 (5th Cir. 1979) ........................................................................20

U.S. Postal Serv. v. Am. Postal Workers Union,
    204 F.3d 523 (4th Cir. 2000) ......................................................................16

United Paperworkers Int'l Union v. Misco, Inc.,
    484 U.S. 29 (1987)................................................................................16, 19

Wellpoint Health Networks, Inc. v. John Hancock Life Ins. Co.,
    547 F. Supp. 2d 899 (N.D. Ill. 2008) ...........................................................21

Westerbeke Corp. v. Daihatsu Motor Co.,
    304 F.3d 200 (2d Cir. 2002)....................................................................19, 20

## STATUTES

Federal Arbitration Act, 9 U.S.C. §§1, *et seq* ..........................................................1, 14

9 U.S.C. § 10(a)(4)....................................................................................1, 14, 15, 20

## OTHER SOURCES

Robert W. Strain, ed., Reinsurance Contract Wording 766 (1992) ..................................1

Robert Samuelson, Asbestos Fraud, Washington Post Editorial, Nov. 20, 2002 ...........8

## PRELIMINARY STATEMENT

Petitioners,[1] certain London market companies ("LMCs") that entered into a reinsurance agreement with Respondent, Century Indemnity Company ("Century"), respectfully submit this brief in support of their petition to vacate an arbitration award pursuant to Section 10(a) of the Federal Arbitration Act, 9 U.S.C. §§1, *et seq.* (the "FAA").

This case presents one of the rare situations in which the Court must step in and vacate an arbitration award in order to preserve the integrity of the arbitration process. The award rendered in this matter violates fundamental notions of fairness and due process. It contains relief ***which neither party requested***, and which materially alters the terms of the parties' contract. As a result, LMCs were denied the right to present witnesses and evidence at the hearing addressing the propriety of the relief that was ordered. In deciding an issue not submitted to it for resolution and granting relief that materially alters the parties' agreement, the arbitrators breached the limits of their jurisdiction. Accordingly, their decision must be vacated.

The relief awarded effectively re-writes key terms of a reinsurance contract[2] the parties negotiated and executed more than forty years ago. The wording of this reinsurance contract defines the types of claims that LMCs are obligated to pay. It also provides that, in the event of a dispute over claims which appear to fall outside the scope of coverage, the parties are to proceed to arbitration. That is exactly what the parties did in this case.

---

[1] Harper Insurance Limited, River Thames Insurance Company Limited and Guildhall Insurance Company Limited.

[2] Reinsurance is "[t]he transaction whereby the reinsurer, for a consideration, agrees to indemnify the ceding company against all or part of the loss which the latter may sustain under the policy or policies which it has issued." Robert W. Strain, ed., Reinsurance Contract Wording 766 (1992). (Exhibit 21 to the Certification of Brian E. O'Donnell dated October 14, 2010 ("O'Donnell Cert.")).

The arbitration award, however, contains a protocol governing certain *future* disputes between the parties. In essence, it precludes LMCs from denying coverage for improper claims submitted by Century. Instead, under the terms of the protocol, LMCs must pay Century 75% of all amounts that it bills LMCs for asbestos bodily injury claims -- even if LMCs have definitive proof that such claims are fraudulent, in bad faith, or simply not covered. The award thus revises the material terms of the parties' contract and turns LMCs into an ATM machine.

Moreover, the relief granted was not requested by either party, before or during the arbitration hearing. No evidence or testimony was ever submitted to the arbitration panel regarding the need for or the effect of a provision requiring the pre-payment of disputed claims. There was not even mention of such relief in the proposed forms of award that Century submitted to the panel for consideration.

The panel itself crafted such relief as an *interim* remedy of its own invention. It issued an interim award and protocol in December 2006 that included this 75% pre-payment provision and provided that the panel would retain jurisdiction until such time as the panel's grant of its own motion, or a motion by one or more of the parties. The panel thus remained available to hear argument and grant relief in the event the pre-payment provision was triggered. Now, after four years during which no pre-payment disputes arose, the panel has converted the interim award and protocol into a final award and terminated its jurisdiction. LMCs are thus left with a different contract than the one they bargained for.

There is no question that the panel's authority in this matter derives exclusively from the parties' reinsurance agreement and pre-hearing submissions. The panel had no authority to impose extra-contractual relief that the parties did not seek and no meaningful opportunity to oppose. By awarding relief outside the scope of the issues and relief submitted to them for

consideration, the arbitrators exceeded their powers. Vacatur of the panel's final award is thus essential, not only to right the harm done to LMCs but to safeguard the integrity of arbitration as a viable dispute resolution process. LMCs, therefore, respectfully request an Order vacating in its entirety the arbitration award rendered on July 15, 2010.

## STATEMENT OF FACTS

**A.      Treaty 101**

More than forty years ago, Century and various reinsurers including LMCs (collectively, with LMCs, "Reinsurers"), entered into a certain Reinsurance Agreement No. 38611, effective January 1, 1965 through December 31, 1967 (referred to herein as "Treaty 101"). (O'Donnell Cert., Exh. 1). Under the terms of Treaty 101, Reinsurers agreed, in exchange for premium, to indemnify Century for certain payments it has made on underlying losses.

Specifically, for losses paid under policies covered by Treaty 101, the contract provides Century with reinsurance coverage limits of $4.5 million per "accident," excess of an underlying $500,000 of loss retained by Century per "accident." (Id. at Art. II). In order to trigger coverage, however, a loss ceded by Century must arise out of "an accident" (as defined in Article IV of the Treaty) which is covered by a policy that falls within certain classes of business (identified in Article I of the Treaty). Further, the loss must exceed Century's retention, and must not be excluded from coverage under Article III or any other relevant terms and conditions of Treaty 101. (Id. at Art. III).

If all of these terms and conditions are met, then the losses ceded by Century are binding on Reinsurers. Article VIII of Treaty 101 memorializes these obligations and provides, in pertinent part, that

> All payments of claims . . . *in which this reinsurance is involved*
> shall be binding upon the Reinsurers, who shall be bound to pay or
> allow, as the case may be, their proportion of such payments.

(Id. at Art. VIII) (emphasis added).  In other words, Treaty 101 requires Reinsurers to indemnify Century, but only for claims "in which this reinsurance is involved," which exceed Century's retention and fall within the coverage provided.  (Id. at Art. VIII).

Treaty 101 *does not* require Reinsurers to pay *any portion* of a claim that is not covered by the terms of the contract.

**B.    The Arbitration**

Century demanded arbitration against LMCs and the other Reinsurers on May 13, 2005 pursuant to the arbitration clause[3] contained in Treaty 101 (the "Arbitration").  (O'Donnell Cert., ¶ 4, Exh. 2).

At or about the same time, Century commenced a number of other arbitrations against Reinsurers, pursuant to the arbitration clauses contained in other reinsurance agreements providing Century with similar coverage during other years and/or attaching at higher loss levels (collectively, with the Treaty 101 contract at issue here, the "Treaty 101 Program").  (O'Donnell Cert., ¶ 5).  At issue in all of these Treaty 101 Program arbitrations was Century's allegation that Reinsurers had breached their contractual obligations by refusing to indemnify Century for asbestos bodily injury losses unless Century presented adequate proof of such losses consistent

---

[3] The arbitration clause states, in pertinent part: "In the event of any dispute between the Company [Century] and the Reinsurers in connection with this Agreement, such dispute shall be submitted to arbitration.  As soon as one party demands arbitration and has named an arbitrator, the other party binds itself to name an arbitrator within one month and the two arbitrators shall then select an umpire."  (O'Donnell Cert., Exh. 1, at Art. XII).

with certain reinsurance documentation requirements or "RDRs."[4]  (See, e.g., O'Donnell Cert., ¶ 6, Exhs. 7, 10).

On May 13, 2005, Century named David A. Thirkill as its party-appointed arbitrator in the Arbitration.  (O'Donnell Cert., ¶ 4, Exh. 2).  On June 13, 2005, Reinsurers identified James Powers as their party-appointed arbitrator.  (O'Donnell Cert., ¶ 7, Exh. 3).  The parties then selected an umpire, Elizabeth M. Thompson, and proceeded to an organizational meeting on February 13, 2006.  (O'Donnell Cert., ¶ 8, Exh. 4).  At that meeting, the panel was accepted by all parties (the "Powers Panel")[5] (O'Donnell Cert., ¶ 10, Exh. 4, Tr. 16:25-17:6), and counsel for Reinsurers and Century executed a confidentiality agreement that shields information generated in the course of the Arbitration from disclosure to unauthorized third parties (O'Donnell Cert., ¶ 11, Exh. 5).

Given the number of arbitrations commenced by Century involving the same issues, parties, Treaty 101 Program contracts and, in some cases, arbitrators, it was agreed that all of the Treaty 101 Program arbitration panels, and all parties and counsel involved in these proceedings, would attend and participate in a single, omnibus hearing to be conducted before one of the

---

[4] The RDRs were adopted in the 2000s as a response to the burgeoning asbestos litigation that threatened to bankrupt not only the manufacturers, distributors, sellers and commercial users of asbestos-containing products but their insurers and reinsurers.  (O'Donnell Cert., Exh. 9, at 11-17).  These circumstances subjected the contractual relationship between Century and Reinsurers, including LMCs, to significant strain.  (Id.)

[5] All three members of the Powers Panel are certified members of ARIAS U.S., the U.S. branch of the AIDA Reinsurance and Insurance Arbitration Society, a non-profit corporation that promotes the improvement of the insurance and reinsurance arbitration process for the international and domestic reinsurance markets.  (O'Donnell Cert., ¶ 9).

panels so constituted (identified herein as the "Hunter Panel").[6]  (O'Donnell Cert., ¶ 12, Exh. 4, Tr. 18:4-25:19).  During the organizational meeting before the Hunter Panel, Umpire Thompson -- the same Umpire sitting on the Powers Panel that issued the final award at issue here -- advised counsel and parties, including LMCs, to *"be very specific in their requests for relief*, to help guide the panel and to help guide each other going forward."  (O'Donnell Cert., Exh. 6 at 124:9-14) (emphasis added).

The Hunter Panel then bifurcated the omnibus arbitration proceeding into three phases: Phase 1A, to address Century's allegations concerning breach of contract and the RDRs; Phase 1B, to address Century's allegations concerning the Reinsurers' purported bad faith; and Phase 2, to address any claim-specific disputes remaining at the conclusion of Phases 1A and 1B.  (O'Donnell Cert., ¶ 14).  Following discovery and briefing, a hearing on Phase 1A was held before the Hunter Panel in New York City, from October 16 through October 21, 2006.  (O'Donnell Cert., ¶ 21).  All Reinsurers involved in the Treaty 101 Program arbitrations (including LMCs), and all panels constituted in those arbitrations (including the Powers Panel), attended.  (Id.)

At the hearing, Century and Reinsurers, including LMCs, submitted documentary evidence and fact witness testimony pertinent to the Phase 1A issues, for the various panels' collective consideration.  (Id., ¶ 22).

---

[6] Members of the Hunter Panel included David Thirkill, party-appointed arbitrator for Century; Ian Hunter, party-appointed arbitrator for Reinsurers; and Elizabeth Thompson, Umpire. (O'Donnell Cert., Exh. 6).  Two of the three Hunter Panel members also sat on the panel that issued the award that is the subject of this Petition.  (Compare id. with O'Donnell Cert., Exh. 4).

### 1.    Century's Arguments

Century argued that Reinsurers, including LMCs, had "made a calculated decision to adopt approaches to the asbestos problem designed to slow down and minimize as much as possible of their payment of asbestos claims." (O'Donnell Cert., Exh. 7, at 2).  To remedy the purported harms wrought by these approaches, Century asked the Powers Panel to issue an order precluding Reinsurers "from further employing this process of delay, and requiring [Reinsurers] to pay Century's asbestos-related reinsurance claims in a timely manner consistent with [Reinsurers'] contractual obligations." (Id. at 3).  Century submitted a proposed form of order to the Powers Panel with its Opening Brief (O'Donnell Cert., Exh. 8), which it later revised and re-submitted as an exhibit to its pre-hearing brief (O'Donnell Cert., Exh. 11) (the "Proposed Order").[7]  The Proposed Order sought by Century contained a very specific request for relief. (Id.).

Among other things, the Proposed Order sought the imposition of a protocol to govern the Reinsurers' future handling and payment of asbestos bodily injury losses. (Id.).  Specifically, the Proposed Order would require that Reinsurers, including LMCs, "pay *or deny* billings submitted by Century within 75 days of receipt," so long as Century had submitted, prior to or with its billings, certain basic information concerning the losses being ceded. (Id., ¶¶ 3-4).

At no time, however, did Century ask the Panel to enter an order requiring Reinsurers to pay any portion of any claims that Reinsurers "deny." (O'Donnell Cert., ¶ 23).  Neither, of course, did Reinsurers. (Id.)

---

[7] Although the Proposed Order was prepared by Century for the Hunter Panel, Century advised that the declaratory relief sought from all Treaty 101 Program arbitrators "will be the same." (O'Donnell Cert., Exh. 9, at 4-5 n. 4).

### 2.     Reinsurers' Arguments

Reinsurers argued that, in light of the onslaught of asbestos claims threatening to bankrupt cedents and reinsurers alike,[8] it was both necessary and appropriate under the terms of Treaty 101 to require that Century demonstrate it had sustained a loss covered by the contract before Reinsurers' payment obligations are triggered.   (O'Donnell Cert., Exh. 9, at 11-17). Reinsurers (including LMCs) thus opposed Century's arguments and its Proposed Order. Among other things, LMCs specifically argued that:

> the *proposed form of order submitted by Century is a broad, sweeping effort to rewrite the Treaty at the expense of [Reinsurers].*   Among other things, Century's proposed order would:
>
> - Relieve Century of its contractual obligation to demonstrate that it has sustained a loss in excess of its retention under the Treaty.   And, instead, trigger [Reinsurers'] payment obligations upon receipt of information purportedly demonstrating that Century has paid underlying claims -- whether or not Century had any arguable obligation to settle or pay such claims . . .
>
> - Relieve Century of its contractual obligation to notify [Reinsurers] promptly of all claims and subsequent developments thereto which may develop into losses under the Treaty.   And, instead, make it acceptable in all situations for first notice of a loss to be provided "before or with" a reinsurance billing . . .

---

[8] Indeed, by the mid-1990s, "for-profit" litigation screenings were commonly being used by the asbestos litigation plaintiffs' bar to generate, on an annual basis, tens of thousands of non-meritorious claims (i.e., claims by individuals with no physical impairment and little likelihood of ever developing any impairment).   See, e.g., Robert Samuelson, Asbestos Fraud, Washington Post Editorial, Nov. 20, 2002 (O'Donnell Cert., Exh. 22) (quoting the admission by one plaintiffs' attorney that "[w]e've gone from a medical model in which a doctor diagnoses an illness and the plaintiff then hires a lawyer, to an entrepreneurial model in which clients are recruited by lawyers who then file suit even when there's no real illness").   This onslaught of asbestos litigation drove many insurance companies out of business, and threatened the solvency of many others.

(O'Donnell Cert., Exh. 12, at 2-3) (emphasis added).  LMCs thus made it clear to the Powers Panel that while the relief sought by Century "may constitute a wish list of Treaty terms Century would like, it certainly cannot be reconciled with the actual terms of the Treaty."  (Id. at 3).

## C.   The Interim Order

Following the omnibus hearing that took place from October 16-21, 2006, the various panels deliberated separately and issued interim relief in the form of separate Interim Orders and Protocols.  (O'Donnell Cert., ¶ 24).

A majority of the Powers Panel issued its Interim Order and Protocol on December 10, 2006 (the "Interim Order").  (O'Donnell Cert., Exh. 13).  The relief contained therein was adapted from that found in the Hunter Panel's interim order.  (Id. at 1; see also O'Donnell Cert., Exh. 14).  These interim awards included protocols which incorporated many of the provisions that Century had submitted to the panels in its Proposed Order -- but also went substantially further.  (Compare O'Donnell Cert., Exhs. 13 & 14 with Exh. 11).

### 1.   The Pre-Payment Provision and the Powers Panel's Retention of Jurisdiction

The interim orders contained relief far in excess of that requested by Century.  Specifically, the Interim Order issued by the Powers Panel includes a Protocol which requires that:

> Within 106 days of the delivery of a billing [by Century] . . . [Reinsurers] ***must pay*** the entire amount billed or the undisputed portion ***plus 75 percent of the disputed portion,*** and present their written objections, if any, to full or partial payment, providing reasonable detail for the grounds for their objections.

(O'Donnell Cert., Exh. 13, Exhibit A, at ¶ 5) (emphasis added).  Under the terms of this Protocol, therefore, LMCs are required to pre-pay to Century 75% of asbestos bodily injury claims they dispute they have any obligation to pay.

The Interim Order further provided that:

9

The Panel will retain jurisdiction over the issues raised by the arbitration demand, including issues or controversies arising out of the Protocol until the Panel's grant of its own motion, a motion by one of the parties (in the event the Panel deems the relief requested appropriate) or a joint motion by the parties.

(Id., ¶ 6).

### 2.   Mr. Powers' Dissent to the Interim Order

As noted above, the Interim Order was issued by a majority of the Powers Panel. Arbitrator James Powers, however, issued a written Dissent to Interim Order, stating his conviction that (i) the Panel had no right to award the declaratory relief sought by Century; and that (ii) the relief awarded "changes the wording of the contract." (Id. at 1 (J. Powers, dissent)).

With regard to the first point, Mr. Powers noted that:

On the first reading of the papers in this case, the question that immediately came to mind was: Did the parties intend that the contract wording allow for an arbitration panel, created by this contract, to grant the declaratory relief being requested by Century. After reading the material submitted:  reviewing the evidence submitted and hearing the testimony during a six day hearing in which a wide variety of topics were covered and then reading the awards or orders made by some of the panels, *I say no*.

(Id.) (emphasis added).  With regard to the second point, Mr. Powers wrote:

After participating in this matter and reading the awards and orders of the different panels and the intended award of this panel, I also questioned the propriety of an insurance/reinsurance arbitration panel to *change the wording of the contract to do what they think should be done in the handling of claims*.

The parties to this contract had been dealing with each other *for decades* and knew the procedures being used by the [Reinsurers] in handling claims.  The parties could have contracted for anything they wanted to do . . . It is *improper for this panel to now impose uniform obligations on [Reinsurers] beyond those bargained for in the contract before us*.

It is improper for the panel to impose *a protocol not contemplated by the parties*.  To do so is rewriting the contract.  While the testimony and exhibits indicate that the parties are both not

> meeting their obligations, and a set protocol should be arranged, this should be done *without changing the wording of the contract. . . . These protocols (and the one imposed by the Order in this case) impose rights and obligations not in the contract nor intended by the parties.*

(Id. at 1-2 (J. Powers, dissent)).

**D.     Subsequent Events**

The Powers Panel retained jurisdiction for more than three years, during which time the Interim Order remained in effect.  (O'Donnell Cert., ¶ 27).  Although Reinsurers objected to the terms of the Interim Order and had ample reason to challenge it, they could not do so.  Being "interim" in nature and not a final award deciding all issues in dispute, the Interim Order could not be challenged under Section 10 of the FAA.  Nonetheless, while the Interim Order remained in effect, the parties dealt with Century's claims amicably and without incident.[9]  (Id., ¶ 28).

Eventually, on May 10, 2010, Umpire Thompson asked the parties to the Arbitration to submit their views on the question whether the Powers Panel should continue to retain jurisdiction.  (O'Donnell Cert., Exh. 15).  The parties submitted their respective arguments in the form of letter briefs dated June 1, June 8 and June 15, 2010.  (O'Donnell Cert., Exhs. 16-19).

In their papers, LMCs noted the length of time that had passed without further disputes between the parties, which itself establishes that "[a]ll issues in dispute between the parties have been resolved" and that the continued jurisdiction of the Powers Panel was no longer necessary.  (O'Donnell Cert., Exh. 16, at 1).  Specifically, LMCs pointed out that

> When formulated and entered by the Panel, the 75% pre-payment provision . . . might have been thought necessary to ensure the resumption of good faith relations between the parties.  Its goal, however, has been achieved.  As noted at the outset, since

---

[9] Indeed, at no time during the three and a half years since issuance of the Interim Order did any of the parties request the Powers Panel's assistance to resolve a dispute concerning the pre-payment provision, which has never been triggered.  (O'Donnell Cert., ¶ 29).

December 2006, Century has not identified *any* problem whatsoever with the parties' ongoing relationship under Treaty 101. And these smooth relations are not due to the operation of the 75% pre-payment provision, because that provision has never once been tested. [LMCs] are not aware of even a *single instance* in which a billing dispute has triggered that provision. Thus, without ever resorting to the pre-payment provision, the parties have succeeded in "get[ting] their long standing relationship back on track." This was, of course, the Panel's primary goal in entering the relief it did . . .

There is, therefore, no basis for a ruling converting the terms of the [Interim Order and Protocol] into a permanent, "Final Order." The Protocol was never intended to be "final." . . . It was adopted by this Panel as an interim measure to encourage the parties to return to a civil, operational, business relationship -- an outcome that has, in fact, occurred.

*On the other hand, converting the interim 75% pre-payment provision into a permanent one will upset the parties' relationship. . . It will improperly impose upon the parties rights and obligations that are not contemplated by any of the terms of the reinsurance contract. Requiring [LMCs] to pre-pay 75% of all disputed asbestos billings, up front and without exception, would force [LMCs] to assume an obligation they never intended to assume, for which they were never compensated. If included in a "Final Order," the 75% pre-payment provision will constitute extracontractual relief to Century that materially reforms the parties' reinsurance contract. . . . A Final Order to that effect would be wholly improper.*

(Id. at 6-7) (emphasis added). For these reasons, LMCs urged the Powers Panel to relinquish jurisdiction without converting the Interim Order and Protocol into a final award. (Id. at 5-7). LMCs further argued, in the alternative, that if the Panel were to enter a Final Order incorporating the terms of the Protocol, those terms should omit the 75% pre-payment provision. (Id. at 7-8).

Century agreed that the Panel should dissolve, but urged the Panel to convert the Interim Order and Protocol into a final award -- including the 75% pre-payment provision that Century had never even requested. (O'Donnell Cert., Exhs. 17-18). Century's position was based,

primarily, on the argument that elimination of the pre-payment provision is unnecessary because "everyone acknowledges [the Protocol] is working."  (O'Donnell Cert., Exh. 18, at 1).  That argument, however, ignores the fact that the prepayment provision was designed to operate as an *interim* measure, "to get the parties' long-standing contractual relationship back to the operational status that had been enjoyed *for decades*, before disputes involving the RDRs arose." (O'Donnell Cert., Exh. 19, at 1) (emphasis in the original).  It also disregards the harm that might result to LMCs with no panel in place to monitor disputes over the prepayment of disputed claims.  As LMCs noted,

> during the last three and half years in which the parties have been operating under the Interim Order and Protocol, the Panel has remained in place, affording significant protection to the parties. Up until now, the Companies could seek redress immediately before this Panel if they believed they were being required to pay claims outside the scope of coverage afforded by the Treaty.  If the Panel disbands, and leaves the parties with a revised reinsurance contract that incorporates the 75% pre-payment provision (which has never been tested), such protection and the contractual harmony it engendered will be destroyed.  This is the fallacy in Century's "if it isn't broken, don't fix it" argument.

(Id. at 2).

E.     **The Final Order**

        After considering the parties' papers, a majority of the Panel entered its Final Order on July 15, 2010 (the "Final Order").  (O'Donnell Cert., Exh. 20).  Therein, the Powers Panel ruled as follows:

        1.     The Panel will not continue further jurisdiction; and

        2.     The December 10, 2006 Interim Order and Protocol shall be deemed part of and incorporated into this Final Order, subject to the following modification:  the last sentence of

> paragraph 8 of the Protocol[10] . . . is modified to read as follows: "If [the parties] fail to agree [on the resolution of LMCs' objections to a loss notification or prepayment of disputed claims] . . . either party may seek arbitration pursuant to the terms of the Treaty."
>
> 3.   Any and all further relief is denied.

(Id.)  Under this language, LMCs must now pre-pay to Century 75% of amounts in dispute -- even if LMCs have definitive proof that the amounts billed arise out of a claim that is fraudulent, in bad faith, or simply not covered.   The 75% pre-payment provision thus became a permanent requirement, which has no basis in the terms of the parties' reinsurance agreement.  (See id., ¶ 1).

For these reasons, LMCs filed the instant petition to vacate the Final Order and Protocol on October 15, 2010, in conformity with Section 10(a) of the FAA.

## LEGAL ARGUMENT

Section 10(a) of the Federal Arbitration Act, 9 U.S.C. §§1, et seq. (the "FAA"), sets forth certain bases on which a party may move to vacate an arbitration award.  To ensure the integrity of the arbitration process, the FAA provides, in pertinent part:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration –
>
> *       *       *
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

---

[10] The "the last sentence of paragraph 8" stated: "If [the parties] fail to agree [on the resolution of LMCs' objections to a loss notification or prepayment of disputed claims] . . . the parties shall notify the [Powers Panel] . . . and their notice shall be treated as an automatic referral of the disagreement to arbitration for determination by *this Panel*."   (O'Donnell Cert., Exh. 13, at Exhibit A, ¶ 8) (emphasis added).

9 U.S.C. § 10(a) (2010).

Section 10(a)(4) provides the basis for vacatur of the Final Order issued by the Powers Panel, which exceeded its powers in several ways. First, the Powers Panel disregarded the plain language of the parties' reinsurance agreement and provided Century with extra-contractual relief in the form of a Protocol that re-writes material terms of the reinsurance agreement. 9 U.S.C. § 10(a)(4). Second, in entering the Final Order, the Powers Panel exceeded its powers by awarding relief that was not requested by either of the parties, in the form of a pre-payment requirement on which no evidence or testimony was ever received. Id.

The Final Order is thus fraught with the arbitrators' own brand of "industrial justice," with arbitrators both re-writing the parties' contract and issuing relief that exceeds the authority delegated to them by the parties contract and pre-hearing submissions. If left to stand, a Final Order like this will only serve to discourage contracting parties from selecting arbitration as a means of dispute resolution.

## POINT I

### THE POWERS PANEL EXCEEDED ITS POWERS BY AWARDING EXTRA-CONTRACTUAL RELIEF THAT RE-WRITES MATERIAL TERMS OF TREATY 101

Arbitrators do not possess unlimited powers. "The law is clear that because arbitration is 'a matter of contract[,] . . . a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." ReliaStar Life Ins. Co. v. EMC Nat'l Life Co., 564 F.3d 81, 85 (2d Cir. 2009) (quoting PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996)). Further, "[t]he scope of an arbitrator's authority . . . 'generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission.'" (Id.) (quoting Synergy Gas Co. v. Sasso, 853 F.2d 59, 63-64 (2d Cir.), cert. denied, 488 U.S. 994 (1988)).

15

Arbitrators may, of course, interpret ambiguous language in the parties' contract. Here, however, there is no ambiguous treaty term from which the 75% pre-payment provision can possibly be derived. Nothing in the Treaty even remotely suggests the Reinsurers' agreement to prepay any portion of disputed claims, and no one -- not Century, and not the Powers Panel -- has ever suggested otherwise. The rule that "[a]n arbitrator cannot re-write a new agreement for the parties" thus applies with particular force here. Collins & Aikman Floor Coverings Corp. v. Froehlich, 736 F. Supp. 480, 484 (S.D.N.Y. 1990), abrogated on other grounds by Barker v. Time Warner Cable, Inc., 897 N.Y.S.2d 668 (Supreme Ct., Nassau County 2009) (quoting Torrington Co. v. Metal Prods. Workers Union Local 1645, 362 F.2d 677, 682 (2d Cir. 1966)). As revised by the Final Award, LMCs' contractual obligations now far exceed those embodied in the language of Treaty 101.

The United States Supreme Court has confirmed that arbitrators "may not ignore the plain language of the contract[.]" United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). Indeed, "[w]hen the arbitrator ignores the unambiguous language chosen by the parties, the arbitrator simply fails to do his job." Patten v. Signator Ins. Agency, Inc., 441 F.3d 230, 236 (4th Cir.), cert. denied, 549 U.S. 975 (2006) (citing U.S. Postal Serv. v. Am. Postal Workers Union, 204 F.3d 523, 527 (4th Cir. 2000)). The Powers Panel has run afoul of these principles. It has ordered relief to Century that distorts key provisions of Treaty 101 in manner the parties never bargained for or even imagined.

For example, Treaty 101 unambiguously provides that LMCs are only bound to pay those claims in which the reinsurance provided by Treaty 101 is "involved." (O'Donnell Cert., Exh. 1, at Art. VIII). Treaty 101 does not require LMCs to pay any portion of asbestos bodily injury claims that do not exceed Century's retention, do not arise out of an "accident," or otherwise fall

outside the scope of the coverage provided.[11]  (Id. at Arts. II, III and IV).  If Century submits such a claim and LMCs dispute it, Treaty 101 provides that either party may commence arbitration against the other -- a course of action that no party takes lightly.  (Id. at Art. XII). This is what the parties to Treaty 101 bargained for and what their reinsurance agreement unambiguously provides:  a mechanism that encourages both parties to perform their contractual obligations in good faith.

The Final Order, however, removes this key protection afforded by the terms of Treaty 101.  It allows Century to obtain, up front, payment of 75% of *any* asbestos bodily injury claim that LMCs dispute -- no matter how meritorious LMCs' objection to payment may be or how questionable Century's claim submission is.  The Final Order thus destroys a key feature of Treaty 101 that has operated *for more than forty years*.  And while the Powers Panel may have performed such a function while it retained jurisdiction, the Panel's jurisdiction is now terminated.  As a result, LMCs are left with an unconscionable contract term.

Where, as here, an arbitration panel enters relief that cannot be rationally derived from the parties' contract, vacatur is warranted.  See PMA Cap. Ins. Co. v. Platinum Underwriters Bermuda, Ltd., 659 F. Supp. 2d 631, 636-37 (E.D. Pa. 2009).  On this point, PMA Capital is highly instructive.  In that case, the arbitrators had been asked to resolve a dispute between a cedent and its reinsurer over the meaning and operation of a key term contained in the reinsurance agreement -- a "deficit carry forward" provision.[12]  The reinsurer ("Platinum")

---

[11] Moreover, as previously noted and discussed below, at no point in the more than forty years since Treaty 101 incepted did Century ever suggest that the parties bargained for and/or agreed that Reinsurers would pre-pay disputed claims.

[12] "A 'deficit carry forward provision' allows the reinsurer to carry forward any loss it may have incurred in one year to the next year, when the reinsurer can apply funds from that year's experience account . . . to offset the first year loss."  PMA Capital, 659 F. Supp. 2d at 633.

sought a declaration regarding its right to retain certain benefits accruing from the "deficit carry forward" provision, an argument the cedent ("PMA") opposed. Id. at 634. The panel heard evidence and testimony, and then issued a one-page award that (i) ordered PMA to pay $6,000,000 to Platinum and that (ii) following such payment, the "deficit carry forward" provision was to be deleted from the parties' contract. Id.

PMA Capital filed a petition to vacate this decision, arguing that it was contrary to both the relief sought by the parties and the plain language of their contract. Id. The court granted the petition, noting that neither party had ever asked the panel to delete the deficit carry forward provision from the reinsurance agreement, or award the immediate payment of any deficit amount to Platinum. Id. at 637. Indeed, the court noted that the contract itself "imposes conditions -- neither of which has been met -- before Platinum may recover any of its deficit from PMA." Under these circumstances, the court ruled that the arbitrators' award could not be rationally derived from the parties' reinsurance contract or their submissions to the panel. Id.

The PMA Capital court concluded that the arbitrators had improperly re-written and "manifestly disregarded" the parties' contract.[13] Id. at 639. Calling the arbitrators' *sua sponte* decision to delete a bargained-for contract term an example of "rough justice," the court ruled the arbitration award "completely irrational," and vacated it. Id.

---

[13] It is worth noting that the PMA Capital court also rejected Platinum's arguments concerning the "honorable engagement" clause contained in the parties' arbitration agreement. 659 F. Supp. 2d at 636-37. An "honorable engagement" typically states that the panel "shall interpret this Agreement as an honorable engagement and shall make their award with a view to effecting the general purpose of this Agreement in a reasonable manner, rather than in accordance with a literal interpretation of the language." (See, e.g., O'Donnell Cert., Exh. 1, at Art. XII). Platinum argued that a clause similar to this confers broad powers on arbitrators, enabling them to order any remedies they deem appropriate. PMA Cap., 659 F. Supp. 2d at 636. The PMA Capital court rejected this argument, noting that "[n]o court has held that such a clause gives arbitrators authority to re-write the contract they are charged with interpreting," but have held just the opposite. Id.

The same relief is warranted here. Instead of interpreting the parties' reinsurance agreement, the Powers Panel has improperly re-written and manifestly disregarded it, thereby exceeding its powers. The arbitrators' *sua sponte* decision to add a contract term that neither party bargained for is, like the arbitration award vacated in <u>PMA Capital</u>, an example of a panel's "rough justice." As such, it is completely irrational, and should be vacated.

**POINT II**

**THE POWERS PANEL EXCEEDED ITS POWERS BY ORDERING RELIEF THAT NEITHER PARTY REQUESTED, ON WHICH NO EVIDENCE OR TESTIMONY WAS EVER SUBMITTED**

LMCs recognize that courts will uphold an arbitration award so long as there is "a barely colorable justification for the outcome reached" by the arbitrators. <u>Matter of Andros Compania Maritima, S.A. of Kissavos (Marc Rich & Co., A.G.)</u> ("<u>In re Andros</u>"), 579 F.2d 691, 704 (2d Cir.1978). This standard, however, only applies *"[i]f the parties agreed to submit an issue for arbitration."*[14] <u>Banco de Seguros del Estado v. Mut. Marine Office, Inc.</u>, 344 F.3d 255, 262 (2d Cir. 2003) (emphasis added); <u>see also United Paperworkers Int'l Union AFL-CIO v. Misco, Inc.</u>, 484 U.S. 29, 38 (1987) (noting that, to confirm an arbitration award, the arbitrator must have been "acting within the scope of his authority"); <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 943 (1995) (Arbitration is "a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration."). Here, the issue of a pre-payment provision was never submitted to the arbitrators for consideration. Consequently, there is no "barely colorable justification" for an award containing such relief.

---

[14] Further, the facts before the Court in the instant petition supporting vacatur do not present a situation where LMCs' allege that the arbitrators failed "to correctly decide a question which all
(footnote continued...)

19

In <u>Totem Marine Tug & Barge, Inc. v. North American Towing Inc.</u>, the Fifth Circuit Court of Appeals was faced with a situation factually similar to the instant one.  607 F.2d 649 (5th Cir. 1979).  There, the parties entered into a charter agreement for a boat owned by the petitioner ("Totem"), which Totem terminated before the agreement expired.  <u>Id.</u> at 650.  The respondent ("North American"), initiated arbitration and submitted to the arbitration panel a request for relief that included a statement of losses.  <u>Id.</u>  North American's request for relief and its briefing, however, did not seek damages for charter hire.  <u>Id.</u> at 650, 651.  Nonetheless, the arbitration panel awarded damages for charter hire that totaled three times the amount of the relief sought by North American in its statement of loss and other submissions.  <u>Id.</u> at 651.

Under these circumstances, as in the <u>PMA Capital</u> case discussed above, the Fifth Circuit ruled that the arbitration panel had exceeded its powers under Section 10(a)(4) of the FAA, by awarding damages for charter hire that the respondent had not requested.  <u>Id.</u>; <u>see also</u> <u>Collins & Aikman</u>, 736 F. Supp. at 487 ("[W]hen the proof submitted at the hearing does not support the award, it should be set aside."); <u>Ashraf v. Rep. N.Y. Secs. Corp.</u>, 14 F. Supp. 2d 461, 464 (S.D.N.Y. 1998) (same); <u>Melun Indus., Inc. v. Strange</u>, 898 F. Supp. 990, 992 (S.D.N.Y. 1990) ("[C]ourts *will* vacate an award where the arbitrator has ruled on issues not presented to him by the parties . . .") (italics in original).

Here, as in <u>Totem</u> and <u>PMA Capital</u>, the Powers Panel had no power to include in its Interim and Final Orders the 75% pre-payment provision that neither party requested in its pre-hearing submissions.  <u>Westerbeke Corp.</u>, 304 F.3d at 220.  At no time prior to the issuance of the Interim Award did Century request this pre-payment provision.  Neither did LMCs.  As a result,

---

concede to have been properly submitted in the first instance." <u>Westerbeke Corp. v. Daihatsu Motor Co.</u>, 304 F.3d 200, 220 (2d Cir. 2002) (quoting <u>In re Andros</u>, 579 F.2d at 703)).

the arbitrators' decision to award relief that is neither supported by the agreement nor sought by the parties represents an "egregious departure[] from the parties' agreed-upon arbitration." Hall Street Assocs., L.L.C. v. Mattel, Inc., 128 S.Ct. 1396, 1404 (2008).  Like the relief awarded in Totem and PMA Capital, the relief awarded by the Powers Panel should be vacated.

## POINT III

### POST-HEARING ARGUMENT IS NOT "EVIDENCE" ON AN ISSUE THE PARTIES PREVIOUSLY AGREED TO SUBMIT TO THE ARBITRATORS FOR RESOLUTION

Century will no doubt point out that it did request, and LMCs did oppose, a Final Order containing the 75% pre-payment provision.   This is true, but it ignores the fact that LMCs *could not* challenge the Interim Order, which was entered after the hearing in this matter and awarded objectionable relief that the arbitrators created on their own initiative, out of whole cloth. Argument submitted *after* the 75% pre-payment provision went into effect (pursuant to the Interim Order) is not "evidence" on an issue the parties agreed to submit to the arbitrators for resolution.  The letter briefs submitted by the parties in June 2010 do not, therefore, constitute the parties' agreement to submit the pre-payment issue to the arbitrators for resolution.

This point merits emphasis, because LMCs would certainly have moved to vacate the Interim Order for the reasons outlined above if the Interim Order had been styled as a "final" award.  It was not.  As a result, LMCs had no recourse but to wait until the Powers Panel entered a final award of some kind.  See, e.g., E.B. Michaels v. Mariforum Shipping, S.A., 624 F.2d 411, 414 (2d Cir. 1980) ("Under the Federal Arbitration Act, *9 U.S.C. § 1 et seq.*, a district court does not have the power to review an interlocutory ruling by an arbitration panel. . . . Where, as here, arbitrators make an interim ruling that does not purport to resolve finally the issues submitted to them, judicial review is unavailable."); see also Wellpoint Health Networks, Inc. v. John

Hancock Life Ins. Co., 547 F. Supp. 2d 899 (N.D. Ill. 2008), aff'd, 576 F.3d 643 (7th Cir. 2009) (holding that, where arbitration proceeded in two phases, the first phase award evidencing that the "arbitrators did not consider their work completed with the entry of the Phase I ruling" was interlocutory and not appealable until the final award was issued).

The Powers Panel has now converted the Interim Award into a Final Award and terminated jurisdiction, without deleting the pre-payment provision previously imposed by the arbitrators, *sua sponte*.  Such relief could not withstand a petition to vacate if the Powers Panel had issued it as a final award.[15]  It should not be permitted to stand now, merely because the Panel reviewed the parties' post-hearing correspondence, and then converted the Interim Order, over LMCs' objections , into a final award.

---

[15] Century itself has conceded that "if altering the [Interim Order and Protocol] in no other way than to end the Panel's jurisdiction renders it extra-contractual, then it was extra-contractual when initially ordered." (O'Donnell Cert., Exh. 18, at 2).  LMCs agree.

## CONCLUSION

For all of the foregoing reasons, LMCs respectfully request an Order vacating in its entirety the arbitration award rendered by the Powers Panel on July 15, 2010.

Respectfully submitted,

RIKER, DANZIG, SCHERER, HYLAND
    & PERRETTI LLP
Attorneys for Petitioners, Harper Insurance Limited, River Thames Insurance Company Limited and Guildhall Insurance Company Limited

By: _____
            Brian E. O'Donnell

Date:  October 14, 2010

4079656.2

No.:

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HARPER INSURANCE LIMITED,
RIVER THAMES INSURANCE COMPANY LIMITED AND
GUILDHALL INSURANCE COMPANY LIMITED,

*Petitioners,*

against

CENTURY INDEMNITY COMPANY

*Respondent.*

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION TO VACATE ARBITRATION AWARD

RIKER DANZIG SCHERER HYLAND &
PERRETTI LLP
500 Fifth Avenue, Suite 4920
New York, NY 10110
Tel.: (212) 302-6574
Fax.: (212) 302-6628
-- and --
Headquarters Plaza
One Speedwell Avenue
P.O. Box 1981
Morristown, NJ 07962
Tel.: (973) 538-0800
Fax: (973) 538-1984

## ATTORNEYS FOR PETITIONERS